# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | | |
|---|---|---|
| Joseph Bratcher,<br>    Plaintiff, | ) ) ) | |
| v. | ) | 1:17cv474 (AJT/MSN) |
| | ) | |
| Harold Clarke,<br>    Defendant. | ) ) | |

## MEMORANDUM OPINION

Joseph Bratcher, a Virginia inmate proceeding pro se, has filed a civil rights action, pursuant to 42 U.S.C. § 1983, alleging that the Virginia Department of Corrections' new policy concerning "Incoming Offender Correspondence" violates his constitutional rights. Now before the Court are plaintiff's Renewed Motion for Preliminary Injunction, Dkt. No. 55, and a Renewed Motion for Summary Judgment filed by Harold Clarke, the Director of the VDOC and the sole defendant in the lawsuit. Dkt. No. 58. For the reasons which follow, the Renewed Motion for Preliminary Injunction will be denied, and the Renewed Motion for Summary Judgment will be granted.

## I. Background

In the Amended Complaint, which is the operative complaint in the lawsuit, Bratcher states that he has been incarcerated at various correctional institutions within Virginia since April 24, 2013, and has been in Virginia Department of Corrections ("VDOC") custody since November 2015. Dkt. No. 10 at 1–2. During that time Bratcher has communicated with his family and friends "by phone, regular mail, and since entering the custody of defendant Clarke and the VDOC, JPay secure messaging (a form of email-like prison messaging, each message costing a 'stamp', which is approximately the same price as a postage stamp, with extrta [sic]

1

'stamps' required for each attachment)." Id. at 1-2.

Bratcher allegedly receives several pieces of mail each month including, but not limited to, "handwritten letters, printed color photographs, drawings and colorings, newspaper articles and Internet printouts." Id. at 2. He "relies on these various forms of correspondence to maintain family ties and keep up with friends," and he "has a deep emotional attachment to these personal items, made even stronger due to the extreme distance between him and his loved ones." Id.

Virginia Code § 53.1-10 authorizes VDOC to "prescribe reasonable rules regarding correspondence privileges and the receipt of books, newspapers and periodicals by prisoners within state correctional facilities." Va. Code § 53.1-35. Pursuant to VDOC's previous correspondence rule, which was set forth in Operating Procedure 803.1, Bratcher could receive "up to five photographs per letter, as well as most drawings/colorings, and holiday/greeting cards that are no larger than 6 1/8" x 11"." Dkt. No. 10 at 2. Under O.P. 803.1, Bratcher had multiple pieces of mail rejected by mail room staff, most often for excess weight. Id. Based on his experience, Bratcher believes "that the mail room staff at each institution he has been [incarcerated] at . . . have done an excellent job at monitoring and inspecting the incoming mail and enforcing [O.P. 803.1]." Id. at 3.

On March 10, 2017, VDOC inmates were notified that VDOC would institute a new correspondence policy aimed at reducing the amount of contraband in VDOC facilities effective April 17, 2017. Id.

A. VDOC Contraband Problem and Interdiction Efforts

The presence of drugs in VDOC facilities undermines its mission to improve public

2

safety because illicit drugs pose a risk of death and overdose to inmates. Vargo Aff. ¶¶ 14–15.[1] Non-fatal drug overdoses often require medical treatment at offsite hospitals and cost thousands of dollars per overdose: VDOC incurs substantial costs transporting offenders to medical facilities. Vargo Aff. ¶¶ 15–16, 18. Some suspected opioid overdoses may be treated onsite with Narcan; however, VDOC also incurs costs "training its officers and medical personnel" to use Narcan in "suspected overdose situations" and identifying suspected overdoses. Vargo Aff. ¶¶ 16–17.

In addition, "each suspected drug overdose . . . requires an investigation at the institutional level." Vargo Aff. ¶ 20. For years, VDOC prisons have combatted the influx of drugs, and after learning that significant amounts of drugs and contraband had been entering VDOC facilities, VDOC officials began to review its visitation and correspondence policies in an effort to solve the problem. Vargo Aff. ¶¶ 6-7, 10. Specifically, front-line security officers, regional administrators, wardens, and members of VDOC's central administration spent months vetting and reviewing multiple plans of action to attempt to stop the increasing flow of drugs into VDOC prisons. Vargo Aff. ¶ 8.

Officials determined that drugs were entering VDOC prisons during in-person visits and through the mail. Vargo Aff. ¶ 21. Specifically, they noticed an increase in the mailing of Suboxone strips—medicated strips prescribed to treat opioid addiction—which were being abused by inmates attempting to achieve a "high." Vargo Aff. ¶ 23–24. The strips, which are between the size of a dime and a quarter, can be cut into smaller sizes and are fairly translucent; thus, they can be easily concealed inside of a letter, card, or envelope. Vargo Aff. ¶ 25. Inmates were concealing the Suboxone strips inside of greeting cards and along the seams of envelopes,

---

[1] The affidavit of Marie Vargo, VDOC's Corrections Operations Administrator, is Exhibit #1 to Defendant's Memorandum in Support of his initial Motion for Summary Judgment, Dkt. No. 32.

sometimes by tape or other adhesive. Vargo Aff. ¶ 26. Despite VDOC's policy of opening and inspecting all incoming offender mail for contraband, mailroom officers were unable to detect all of the Suboxone strips entering VDOC facilities, and the strips were "frequently discovered in the possession of offenders."[2] Vargo Aff. ¶ 26. Officials determined that "family members and friends of offenders" rather than "vendors, government agencies, attorneys, and educational organizations" were the source of "almost all of the contraband that was entering prisons through the mail." Vargo Aff. ¶ 30.

In response to these issues, "VDOC took steps to significantly reduce the amount of paper items that an offender may receive in the mail" by revising its visitation and mail policies. Vargo Aff. ¶¶ 9, 28. VDOC's revised mail policy gives rise to the instant action.

**B.** New Inmate Correspondence Policy and its Effects

*i. VDOC Correspondence Policy*

Under VDOC's prior mail policy offenders could "receive incoming general correspondence via the mail as long as the correspondence was processed by the United States Postal Service as equivalent to or less than the contents of a one-ounce (1 oz.) domestic first class letter." Vargo Aff. ¶ 29. Pursuant to the old mail policy, all incoming mail was subject to being opened and inspected, and if it passed inspection it was given to the offender. Vargo Aff. ¶ 29.

In March, 2017, David Robinson, VDOC's Chief of Corrections Operations, circulated a memorandum advising VDOC officials of impending changes to VDOC's mail procedures. Vargo Aff. ¶ 31. The memorandum provided, in relevant part:

---

[2] Other drugs, like LSD or "acid," are also produced in a strip form that can be easily concealed on or in paper and correspondence similar to the methods used for the Suboxone strips. Vargo Aff. ¶ 27.

Over the past year, facility staff have discovered a substantial amount of contraband entering DOC facilities through the facility visiting room and the facility mailroom. A significant portion of this contraband has been drugs. Due to the increasing amount of contraband entering our facilities and in order to ensure a high level of safety and security for all Department of Corrections (DOC) staff, visitors and offenders, it is essential that the Department implement additional security measures aimed at detecting and eliminating contraband in DOC facilities. In support of this effort, a "Controlling Contraband from Entering Facilities" working dialogue was conducted with the goal of comprehensively reviewing current DOC operating procedures and practices and recommending additional measures to be taken in order to address this issue

As a result of this dialogue, changes to current DOC operating procedures and facility practices were recommended and a comprehensive interdiction strategy was developed which incorporated current procedural requirements and practices with the additional measures recommended by the "Controlling Contraband from Entering Facilities" workgroup.

Dkt. No. 32-1, Enclosure A.

On March 13, 2017, VDOC prisoners, including Bratcher, were advised of the upcoming policy change in letters from the wardens of their respective facilities. Vargo Aff. ¶ 36. As to inmate mail, the letter set forth the following policy:

**Incoming Offender Correspondence (Effective April 17, 2017)**
1. **All Security Level 2 and above Institutions.** All incoming offender general correspondence to include the envelope at Security Level 2 and above Institutions will [sic] photocopied in the institutional mailroom and a maximum of three black and white photocopied pages front and back will be provided to the offender.
   - The original envelope, letter and all enclosed contents will be shredded in the institutional mailroom. Exceptions to this requirement include but are not limited to official legal, government and court ordered documents such as military records (i.e. DD214), Court documents (i.e. divorce decrees, name change orders), etc. Before any action is taken on these documents, facility management staff must be consulted. Personal Identification Documents will continue to be forwarded to the facility Records Office for processing.
   - Offenders will be limited to receiving a maximum of three, 8 ½ X 11, black and white photocopied pages front and back to include the photocopy of the envelope. Each item in the envelope i.e., photograph, newspaper clipping, drawing, each side of a letter, etc. will be considered one photocopy.
   - Enclosed items (photographs, greeting cards, newspaper articles, etc.) will not be manipulated to print multiple items on a single photocopied page. Items that exceed the established size limitation will not be manipulated to fit on a single or multiple 8 ½ X 11 photocopy pages.
   - The entire correspondence and all enclosed items that exceed the established

      photocopy or size limit will be returned to the sender with the *Notice of Unauthorized Correspondence* 803_F2 advising the sender of the reason for the return.

2. Individuals will still be permitted to send offenders secure messages, photographs, and other attachments through the JPay system as is currently authorized. Additionally, offender pictures during visitation will still be permitted in accordance with Operating Procedure 801.6, *Offender Services*

3. Incoming legal correspondence and special purpose correspondence will be processed in accordance with the current procedural requirements as provided in Operating Procedure 803.1, *Offender Correspondence.*

Under this new policy institutional mailroom staff does not keep electronic copies of prisoner correspondence or maintain a file of the photocopied documents sent to prisoners. Vargo Aff. ¶ 34. Mailroom staff is instructed not to read the mail or to restrict the mail based on its content. Vargo Aff. ¶ 35. In other words, the updated policy applies to all incoming paper mail from the public regardless of its content. Vargo Aff. ¶ 35.

In addition, prisoners may still communicate with members of the public who have agreed to accept messages from them by purchasing and using a JPay device, which is a small, touch-screen device, similar to a tablet that is specifically designed to operate within a prison system, or through the JPay secured messaging system, which is similar to email. Vargo Aff. ¶¶ 38, 42. Prisoners can use JPay to send and receive secure electronic messages by purchasing a JPay "stamp," which costs about the same as a USPS first class stamp. Vargo Aff. ¶¶ 39–40. Members of the public wishing to send secured messages to offenders can also do so by signing up for an account and purchasing "stamps." Vargo Aff. ¶ 42. Individuals with JPay accounts are able to attach photographs to their secured messages, and offenders can save photographs to their JPay devices. Vargo Aff. ¶¶ 43-44. Bratcher owns a JP5 player and is able to send and receive secured messages on his device. Sivels Aff. ¶ 3.

The correspondence policy does not interfere with prisoners' ability to receive and to possess original photographs taken at their institutions during visitation. Vargo Aff. ¶ 45. These

photographs are taken and processed by VDOC staff members, who then provide them to the prisoners. Vargo Aff. ¶ 45. In addition, prisoners may order and receive photographs mailed directly from prison vendors, some of which allow prisoners' family members and friends to upload or share photos, which the vendors print as photographs and mail to the prisoners. Vargo Aff. ¶ 46. None of these photographs are subject to the photocopying policy "because VDOC has not experienced a high volume of contraband entering the prison via vendor-supplied photographs." Vargo Aff. ¶ 46.

*ii. Effects of New Correspondence Policy*

Since implementing the new mail and visitation policies, "VDOC has seen a significant decrease in the number of offender overdoses and drug-related incidents." Vargo Supp. Aff. ¶ 8.[3] Specifically, from July 1, 2016 to April 30, 2017, a period governed almost exclusively by the old mail policy, VDOC logged a total of 761 drug-possession incidents at its facilities.[4] Vargo Supp. Aff. ¶ 9. From May 1, 2017 to February 28, 2018, a period governed exclusively by the new policy, VDOC logged a total of only 321 documented drug-possession incidents. Vargo Supp. Aff. ¶ 10. This represents a decrease in the number of documented drug-possession incidents in VDOC facilities of approximately 58%. Vargo Supp. Aff. ¶ 11.

In addition, in 2016 there were four medically-confirmed deaths due to drug overdoses in VDOC facilities;[5] between January 1 and April 30, 2017, there were three medically confirmed

---

[3] The Supplemental Affidavit filed by Marie Vargo is Exhibit 1 to defendant's Memorandum in Support of his Renewed Motion for Summary Judgment, Dkt. No. 59.

[4] A "drug-possession incident" includes "suspected drugs in an offender's possession, suspected drugs in a common area, confirmed drugs in an offender's possession, confirmed drugs in a common area, and drug paraphernalia in an offender's possession and in common areas." Vargo Supp. Aff. ¶ 9.

[5] An additional five deaths occurred in 2016 that VDOC suspects were caused by drug

deaths due to drug overdoses in VDOC facilities; and from May 1, 2017 to December 31, 2017, there were no medically confirmed deaths due to drug overdose in VDOC facilities.[6] Vargo Supp. Aff. ¶¶ 13–15. Thus, since instituting its new policies, VDOC has experienced decreases in both overdose deaths and non-fatal overdose. Vargo Supp. Aff. ¶ 19.

Although the new correspondence policy has increased photocopying costs and requires additional staff time in institutional mailrooms, VDOC believes that this increase is justified by the diminished number of recent and known inmate overdose deaths. Vargo Aff. ¶ 47.

The new policy has affected Bratcher's ability to receive physical copies of his mail. Since the new policy took effect in April eight pieces have been subjected to the new restrictions, which resulted in the originals being destroyed. Dkt. Nos. 27 at 1, 40 at 1.

## II. Procedural History

On April 11, 2017, Bratcher filed the complaint in this action, seeking a permanent injunction to prevent VDOC from implementing the new mail policy and a declaration that the new mail policy is unconstitutional. In addition, the complaint was accompanied by a Motion for a Temporary Restraining Order and Preliminary Injunction seeking to prevent the VDOC from implementing its proposed new policy. Dkt. Nos. 1, 4. By an Order dated May 4, 2017, Bratcher was directed to particularize and amend his complaint, and he submitted the Amended Complaint on May 25, 2017. Dkt. No. 10.

By an Order dated June 6, 2017, Bratcher's Motion for a Temporary Restraining Order and Preliminary Injunction was denied as premature. Dkt. No. 14. On June 23, 2017, Bratcher filed both a Motion for Reconsideration of the June 6 Order and a notice of appeal. Dkt. Nos.

---

overdoses; however, no cause of death has been confirmed in those cases. Vargo Aff. ¶ 13

[6] As of March 6, 2018, no additional suspected deaths related to drug overdoses had occurred in the VDOC in calendar year 2017. Vargo Supp. Aff. ¶ 16.

16–18. The notice of appeal was transmitted to the United States Court of Appeals for the Fourth Circuit on June 26, 2017, and the Motion for Reconsideration was denied on June 30, 2017. Dkt. Nos. 19–20.

On August, 2017, while the appeal was pending, Bratcher filed a Renewed Motion for a Preliminary Injunction. Dkt. Nos. 26–27. By an Order dated August 9, 2017, the motion was denied, without prejudice. Dkt. No. 28.

In an unpublished opinion issued on February 12, 2018, the Fourth Circuit Court of Appeals dismissed Bratcher's appeals of the June 6 Order denying his Motion for a Temporary Restraining Order as premature and the June 30 Order denying his Motion for Reconsideration of that decision. Bratcher v. Clarke, R. No. 17-6987 (4th Cir. Feb. 12, 2018); Dkt. No. 51. Additionally, the appellate court determined that it had jurisdiction to review the August 9 Order denying Bratcher's renewed motion for a preliminary injunction because he had challenged that ruling in his informal brief; as to that Order the court vacated and remanded for further proceedings on the holding that more particularized findings of fact and conclusions of law were required to support the decision. Id. On February 26, 2018, Bratcher filed the Renewed Motion for Preliminary Injunction now under consideration. Dkt. No. 55.[7]

While the foregoing appeal was pending, defendants filed a Motion for Summary Judgment, along with the notice required by Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K). Dkt. No. 31 - 33. Because it concerned the same issues involved in the appeal, the Motion for Summary Judgment was dismissed without prejudice on February 8, 2018. Dkt. No. 50. Defendants renewed their motion for Summary Judgment on March 8, 2018, and again provided Bratcher with the appropriate Roseboro notice. Dkt. No. 58-59, 61. On April 3, 2016, Bratcher filed a partial response to defendants' motion captioned as a Rule 56(d)

---

[7] In the Renewed Motion for Preliminary Injunction, Bratcher readopts the arguments he advocated in his August, 2017 Motion for Preliminary Injunction and accompanying memorandum of law. Dkt. No. 26 -27.

Affidavit, Dkt. No. 68, and after he was supplied with copies of all unpublished opinions relied upon by the defendants, he filed his Response in Opposition to Renewed Motion for Summary Judgment on August 23, 2018. Dkt. No. 77. Accordingly, both plaintiff's Renewed Motion for Preliminary Injunction and defendants' Renewed Motion for Summary Judgment are ripe for disposition.

### III. Plaintiff's Renewed Motion for Preliminary Injunction

For a plaintiff to obtain a preliminary injunction, he must demonstrate: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm without such injunctive relief; (3) that the balance of equities weighs in his favor; and (4) that granting a preliminary injunction is in the public interest. Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 20 (2008). To obtain injunctive relief, a plaintiff must satisfy all four of these factors. See Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009), vacated by Real Truth About Obama, Inc. v. Fed. Election Comm'n, 559 U.S. 1089 (2010), reissued, 607 F.3d 355 (4th Cir. 2010). Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. North Carolina State Ports Authority v. Dart Containerline Co., Ltd., 592 F.2d 749, 750 (4th Cir. 1979). In addition, "[c]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982).

"Preliminary injunctions are not to be granted automatically." Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980). Indeed, a preliminary injunction is an extraordinary remedy never awarded as of right. Munaf v. Geren, 553 U.S. 674, 689–90 (2008).

### A. First Amendment

Bratcher first seeks a preliminary injunction on the ground that he has a First Amendment

10

right "to communicate by mail and correspond with nonprisoners," and the new correspondence policy, "by stopping mail intended for the plaintiff and permanently destroying it, prevents the correspondent from associating with the plaintiff, violating the First Amendment." Dkt. No. 27 at 3; Dkt. No. 10 at 6. For the reasons stated below, Bratcher's position satisfies none of the Winter factors, and hence must be rejected.

### i. Likelihood of Success on the Merits

The question of whether a prison regulation can withstand a constitutional challenge is controlled by Turner v. Safley, 482 U.S. 78, 89 (1987). Under Turner, a court must consider (1) whether there is a "rational connection" between the challenged regulation and a legitimate government interest; (2) whether there are alternative means for prisoners to exercise the allegedly affected right; (3) the impact an accommodation of the asserted right will have on other inmates, guards, and prison resources; and (4) whether "ready alternatives" to the challenged regulation exist. See Turner, 482 U.S. at 89–90. This standard is one of reasonableness: a regulation is valid "if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. It does not "[s]ubject[] the judgment of prison officials to an inflexible strict scrutiny analysis," nor does it involve inquiry into the "least restrictive means." Id. Courts are required to allow prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). It is the inmate's burden to disprove the validity of a prison regulation. Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

### a. Rational Connection to Legitimate Governmental Interest

For a prison regulation to survive a constitutional challenge there must be a "valid,

11

rational connection" between the challenged prison regulation and the "legitimate governmental interest put forward to justify it." Block v. Rutherford, 468 U.S. 576, 586 (1984). "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89–90. In addition, the stated governmental objective "must be a legitimate and neutral one." Turner, 482 U.S. 90. The Supreme Court has observed that it is "important to inquire whether prison regulations restricting inmates' First Amendment rights operate[] in a neutral fashion, without regard to the content of the expression." Turner, 482 U.S. at 89–90 (citing Pell v. Procunier, 417 U.S. 817 828 (1974)). Courts must take into account that judgments involving prison security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Pell, 417 U.S. at 827.

Here, Bratcher acknowledges that "[t]he asserted purpose put forth by the defendant is limiting the flow of contraband, mostly drugs, from entering the prisons by the mail" and concedes that "[t]his is absolutely a legitimate interest;" however, he contends that the challenged mail policy is "not 'reasonably related' to this interest, i.e. [it is] an exaggerated response." Dkt. No. 6 at 4. Based on experiential and anecdotal evidence, Bratcher argues that "there is little evidence that there is a serious problem with contraband entering the prisons through the mailrooms."[8] Dkt. No. 6 at 4; Dkt. No. 27 at 4. Specifically, he states that he has

---

[8] According to Bratcher, from December 2015 to March 2017, he "asked the same set of questions to numerous inmates, each of whom answered the same as the inmates at Nottoway and as each other: drugs come in through anuses or officers." Dkt. No. 27 Pl. Decl. Supp. Mot. Prelim. Inj. at 1–2. He allegedly received the same answer at his "current place of incarceration, St. Brides Correctional Center." Dkt. No. 27 Pl. Decl. Supp. Mot. Prelim. Inj. at 2. In addition,

talked to "inmate advisors (who assist with disciplinary proceedings)" at his institution, and they have advised him that "no mailroom based drug charges had occurred in years." Dkt. No. 27 at 4. In addition, Bratcher contends that "all drugs he has seen come in [to his current institution, St. Brides Correctional Center,] have come in through anal smuggling in the visitation room, or from officers who break the law." Dkt. No. 27 at 4–5.

In Bratcher's view, prisoners are being deprived of their original pieces of mail "because the defendant's subordinates are not doing their job[s] well enough," and laments that, instead of "hir[ing] more efficient employees," VDOC's solution is to "withhold all mail and destroy it, giving the inmate only a black & white photocopy instead." Dkt. Nos. 6 at 4; 27 at 4. He uses an analogy in support of his opinion stating, "[j]ust as a small number of inmate suicides committed by hanging by bed sheets would not justify a total, state-wide, permanent ban on inmate linens, a few incidents of contraband slipping past prison officials cannot justify the total withholding and destruction of every inmate's mail." Dkt. No. 6 at 5. According to Bratcher, VDOC's new policy is "even more irrational and unreasonable" because unauthorized correspondence is not scanned and destroyed, but "returned directly and immediately to the sender." Dkt. No. 6 at 5; Dkt. No. 27 at 5. He believes that any "policy that totally destroys inmates' mail, yet treats contraband with the utmost care and dignity cannot be 'reasonable;' it is absurd." Dkt. No. 6 at 5; Dkt. No. 27 at 5. In Bratcher's opinion, VDOC's former mail policy sufficiently addressed the issue of illegal contraband, and he points out that courts have "struck down policies because other policies or practices already serve the interests at stake." Dkt. No.

---

he asserts that "the few drugs coming into the prison are brought in by officers, some of whom are rumored to be affiliated with the "Bloods" gang, which has a large population at St. Brides." Dkt. No. 27 Pl. Decl. Supp. Mot. Prelim. Inj. at 2. Aside from these hearsay opinions of fellow inmates, Bratcher offers no proof to support his allegations regarding drug smuggling by prison guards or their alleged membership in gangs.

27 at 6.

Defendant counters that both jail security and rehabilitation are legitimate penological interests," and VDOC's decision to revise its visitation and correspondence policies is aimed at maintaining facility security, rehabilitating offenders, and reducing the introduction of contraband into the prison environment. Dkt. No. 32 at 2. According to defendant, his responsibilities under the Code of Virginia include maintaining "security, discipline, and good order in their facilities," which requires that he control contraband entering the prisons, control disruptive or illegal activities, and ensure the safety and well-being of offenders and institutional staff. Dkt. No. 32 at 2. In addition, defendant points out that "Bratcher does not dispute that drugs can be smuggled through the mail, nor does he dispute that preventing contraband from entering prison is a legitimate governmental interest." Dkt. No. 32 at 13.

Defendant points out that between May 15, 2016 and May 15, 2017, as described above, there were a total of 61 suspected drug overdoses in VDOC facilities, and in 2016 there were four confirmed overdose deaths and another five suspected overdose deaths. Vargo Aff. ¶¶ 12–13; Dkt. No. 32 at 12; Dkt. No. 59 at 17. VDOC investigations conducted following the discovery of drugs or after prisoner overdoses revealed that members of the public were mailing Suboxone strips to prisoners. Vargo Aff. ¶ 22; Dkt. No. 59 at 17. VDOC considered how to solve this problem by deliberating for many months and reviewing the previous visitation and correspondence policies, and ultimately decided to revise its mail and visitation policies. Vargo Aff. ¶ 6-7; Dkt. No. 32 at 12. Defendant asserts that this change was "reasonably related to VDOC's desire to keep the offenders safe, as well as VDOC's directive to run a secure prison system." Dkt. No. 32 at 12.

Based on the foregoing, the Court concludes that VDOC's new prison mail policy is

reasonably related to its legitimate interest in jail security and prisoner rehabilitation. Defendant has shown a logical connection between the regulation and the asserted goal of maintaining security and prisoner rehabilitation. Investigations revealed that drugs—Suboxone in particular—were being smuggled into the prisons using original paper mail, and prisoners were overdosing on those drugs. See Lee v. Md. Div. of Corr., No. CV CCB-16-439, 2017 WL 713760, at *5 (D. Md. Feb. 22, 2017) ("Defendants have presented a clear penological objective, namely, to deter criminal activity and maintain prison security by restricting drugs and contraband from entering the facility through a known inconspicuous method, i.e., the use of greeting cards to smuggle sublingual strips of Suboxone film into prisons."); Covell v. Arpaio, 662 F. Supp. 2d 1146, 1153-55 (D. Ariz. 2009) (upholding policy of restricting incoming, non-privileged prisoner correspondence to metered, non-stamped postcards after finding it was reasonably related to legitimate penological interest in reducing contraband smuggling). VDOC did not act rashly in response to this problem; rather, officials deliberated for many months and ultimately decided to update its correspondence and visitation policies. The policy is content-neutral, and does not deprive prisoners of the contents of any letters. Indeed, the prisoners receive a photocopy of all correspondence that is accepted by a prison mailroom.[9]

Bratcher's assertions that VDOC's former mail policy sufficiently addressed the issue of illegal contraband are simply incorrect, as VDOC investigations revealed that contraband was being smuggled into prisons through institutional mail rooms. The personal recollections and anecdotal evidence offered by Bratcher to disparage the new mail policy are unpersuasive in

---

[9] Although Bratcher believes VDOC's new policy is "absurd," VDOC's decision to destroy original correspondence after it has been photocopied is rationally related to its desire to prevent contraband from entering VDOC facilities. The institution does not photocopy and destroy original correspondence that violates mail policy because that mail is returned to the sender, and therefore, poses no risk to prisoner safety.

light of the defendant's empirical evidence that the policy has made a measurable difference in reducing both overdose deaths and non-fatal overdose incidents within VDOC. Even if contraband is entering prisons through means other than the mail, judgments involving prison security "are peculiarly within the province and professional expertise of corrections officials," and there is no evidence in the record to show that defendant's comprehensive response to the drug issue, which included updating both the mail and visitation policies, was an "exaggerated" response, and this Court must defer to defendant's expert judgment in such matters. Pell v. Procunier, 417 U.S. 817, 827 (1974). Accordingly, this Turner factor weighs in favor of defendant.

### b. Alternative Means to Exercise the Infringed-Upon Right

Second, a court in assessing the constitutionality of a prison regulation must consider "whether there are alternative means of exercising the [asserted] right that remain open to prison inmates." Turner, 482 U.S. at 90. "'[T]he right in question must be viewed sensibly and expansively." Thornburgh v. Abbott, 490 U.S. 401, 417 (1989). For example, in assessing a Missouri regulation banning inmates from corresponding with prisoners at other institutions within the state, the United States Supreme Court looked to whether the regulation deprived prisoners of "all means of expression," rather than whether inmates had other means of communication with state inmates at different institutions. Turner, 482 U.S. at 92. If alternative means exist, a reviewing court must be particularly mindful of the judicial deference owed to corrections officials while assessing the validity of a challenged regulation. Turner, 482 U.S. at 90.

According to Bratcher, neither black and white photocopies nor JPay communications are "real, acceptable alternatives" to his original paper mail. Dkt. No. 6 at 7. He argues that

prisoner mail often "consists of personal, handwritten letters or notes, printed color photographs on photo paper, various greeting/holiday cards, and/or laboriously constructed drawings/colorings" from friends and family, and if "a correspondent has taken the time to hand write a letter, perhaps adding as a personal touch a unique, bright color ink or paper, a black and white photocopy is far from a true alternative." Dkt. No. 6 at 7. In plaintiff's view, a photocopy or JPay copy "does not encompass the unique aspects that made a personal letter personal." Dkt. No. 6 at 7. Specifically, plaintiff asserts that the available alternatives fail to take into account the "resources or actual money" used by friends and family "to purchase decent quality photographs, in full color, to send to a prisoner" because prisoners receive "a fuzzy, shadowed, black and white photocopy on standard printer paper." Dkt. Nos. 6 at 7, 27 at 6.

Bratcher argues that JPay is not an acceptable alternative to paper mail because inmates must either pay approximately fifty dollars for a "JPS music player" or view JPay messages "by logging onto the inmate kiosk," which may be used for a maximum of "3, 20 minute sessions per day" and can be difficult to access in units where "kiosks are hogged by other inmates."[10] Dkt. No. 6 at 8. Bratcher also alleges that JPay messaging is "costly for prisoners' friends and family" because "[e]ach message sen[t] through JPay costs a 'stamp', around $0.50 each (cheaper rates are available when bought in bulk), and each attachment (picture) cost another 'stamp.'" Dkt. No. 6 at 8. Plaintiff further asserts that some inmates may have difficulty viewing "pictures and messages . . . downloaded to the player . . . due to the small screen size on the player," but he does not allege that he has any difficulty doing so personally. Dkt. No. 6 at 8.

Defendant argues that inmates, including Bratcher, may continue to exercise their First Amendment right to correspondence under the new policy because it "does not prohibit access to the

---

[10] In some higher security level facilities, kiosks are not available; however, plaintiff does not allege that his institution lacks kiosks. Dkt. No. 6 at 8.

content of an offender's mail, including letters or greeting cards." Dkt. No. 32 at 14; Dkt. No. 59 at 19. Specifically, defendant points out that prisoners "retain a copy of their original mailing" and "no content is censored or otherwise prohibited." Dkt. No. 32 at 14. Defendant also reveals that "Bratcher possesses a JPay device," which allows him "to send and receive secure messages with family and friends." Dkt. No. 32 at 14. In addition, defendant discusses several ways in which Bratcher may obtain photographs. For example, prisoners may "possess [original] photographs that are taken during visitation" and original photographs uploaded by an inmate's friends or family to a vendor website, printed by the vendor, and mailed to the prisoner. Dkt. No. 32 at 14; Vargo Aff. ¶ 46; Dkt. No. 59 at 20.

Defined expansively, the issue here is whether plaintiff has alternative means of asserting his right to communicate with friends and family, not whether he is provided virtually identical copies of all correspondence sent to him. Indeed, Bratcher's main grievances concerning the alternatives available to him and other prisoners with respect to the new mail policy relate to the quality of the copies provided and the increased costs to prisoners and correspondents. These issues are undoubtedly of paramount concern to plaintiff and the Court acknowledges the sentimental importance of personalized letters and pictures to prisoners. In addition, the Court understands that inmates would prefer to receive the original copies of all correspondence; however, under the law "alternatives . . . need not be ideal; they need only be available." Overton v. Bazzetta, 539 U.S. 126, 135 (2003); see also Murphy v. Missouri Dep't of Corr., 372 F.3d 979, 983 (8th Cir. 2004) ("A prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so.").

Bratcher does not allege that the alternatives available under the new policy prevent prisoners from meaningfully exercising their right to correspond, only that their exercise of that right may be rendered slightly more burdensome and/or expensive. Such conditions do not

abrogate the available alternatives. See McKenzie v. Fabian, No. CIV. 07-4441PAMJSM, 2009 WL 2982641, at *11 (D. Minn. Sept. 11, 2009) (concluding that a prison regulation that imposed a lower weight limit on non-legal correspondence satisfied the second Turner factor because of the available alternative of separating any returned mail into multiple envelopes). Therefore, the second Turner factor also weighs in favor of defendant.

### c. Impact of Accommodation

A third consideration relevant to the constitutionality of a challenged prison regulation is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Turner, 482 U.S. at 90. "Prison administration often involves tough tradeoffs," and "greater liberties for some may mean increased danger . . . for others." In re: Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 470 (4th Cir. 1999). In addition, there are few changes in the prison context that have "no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order;" and courts should be particularly deferential when the "accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff." Turner, 482 U.S. at 90 (citing Jones v. North Carolina Prisoners' Union, 433 U.S., 119, 132–133 (1977)). This is especially true where a challenged policy affects multiple correctional institutions. See Turner, 482 U.S. at 92. If the right in question "'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' [Turner, 482 U.S. at 92], the courts should defer to the 'informed discretion of corrections officials.' id. at 90." Thornburgh v. Abbott, 490 U.S. 401, 418 (1989).

Bratcher contends that there would be almost no effect at all if his request for a preliminary injunction is granted and VDOC is "required to go back to the previous mail policy."

Dkt. No. 27 at 7. In his view, the prior mail policy "worked smoothly for years" and "was by and large adequately enforced." Dkt. No. 27 at 7. He concedes that if VDOC returns to its former mail policy "[i]t is certainly possible that . . . some foolish inmates might try to take advantage . . . by attempting to have contraband sent in;" however, he contends that "with the VDOC staff state-wide doing an excellent job, any inmates stupid enough to try would be quickly caught and disciplined." Dkt. No. 27 at 7. Moreover, he asserts, without further support, that "[s]uch mere possibilities would be few and far between nonetheless." Dkt. No. 27 at 8.

According to Bratcher ,"[t]he only real effect that would occur [if the previous policy were reinstated] is that the state would save funds and resources by not having to make needless photocopies for thousands of pieces of mail daily." Dkt. No. 27 at 8. He further alleges that his preliminary injunction would save the state additional funds by foreclosing further challenges to the current policy by inmates who "might be inclined to seek damages (unlike the plaintiff here) to compensate for the mail that has already been destroyed." Dkt. No. 27 at 8. Without specifying how, Bratcher also asserts that "the grant of preliminary relief would help to ease the already high and ever growing tensions between inmates and prison officials, which is always a positive outcome." Dkt. No. 27 at 8.

Defendant contends that if original mail "were permitted in the prisons, it would allow contraband and drugs to enter the prison[s]," which would "unduly burden prison resources" by requiring VDOC staff to address resultant security issues. Dkt. No. 32 at 15. In defendant's view, VDOC officials "are not required to wait for a particular disruption to occur before they can take reasonable measures to abate it." Dkt. No. 32 at 15. Defendant admits that VDOC's new policy "requires some additional resources to copy the incoming correspondence," but asserts that "the expense is worthwhile." Dkt. No. 32 at 15. According to defendant, permitting

prisoners "to receive the original documents would be more costly and unsafe for the prison environment" because prisoners "who receive original mail and then go on to overdose or even worse, perish from the drugs in the mail, utilize far more prison resources than are currently utilized to implement this policy." Dkt. No. 32 at 15. Defendant cites "transportation to a hospital facility" and "thorough investigation[s] into . . . overdose[s] and death[s]" as examples of the costs involved in prisoner overdoses. Dkt. No. 32 at 15.

Defendant states that "[s]ince the implementation of the new correspondence policy, VDOC has seen a marked decrease in all manner of drug-related incidents in VDOC facilities." Dkt. No. 59 at 22. Defendant also points out that "non-fatal overdoses have . . . decreased markedly since the implementation of the new policy." Dkt. No. 59 at 22. In defendant's view, "returning to the old policy would likely result in an increase in drug overdose deaths, non-fatal drug overdose incidents, and an increase in the number of times drugs or suspected drugs were found in an offender's possession." Dkt. No. 59 at 23.

The main thrust of Bratcher's argument is that reinstituting the former institutional mail policy would have virtually no impact "on guards and other inmates, and on the allocation of prison resources generally," and it would reduce VDOC's copying costs. These assertions are belied by the record, however, which demonstrates instead that VDOC incurs far more substantial costs as a result of inmate drug overdoses. Moreover, the statistical evidence adduced by defendant reveals that the incidence of overdoses has decreased since VDOC has implemented its new mail and visitation policies. In light of the information provided by defendant, reinstituting the former mail policy would undermine VDOC's institutional mandate to ensure the safety and security of its facilities and would "have a significant 'ripple effect' on fellow inmates or on prison staff," even if it resulted in decreased copying costs. See Turner, 482

21

U.S. at 92 (concluding that the potential "ripple effect" is even broader when exercise of the right affects the inmates and staff of multiple institutions). Accordingly, VDOC's determination that it would be inadvisable to revert to its former mail policy will be given deference, and the third Turner factor also weighs in defendant's favor.

### d. Obvious Easy Alternatives

The final factor that should be considered by a court reviewing the constitutionality of a prison regulation is whether there are ready alternatives to the challenged regulation. Turner, 482 U.S. at 90. The absence of ready alternatives is evidence of a regulation's reasonableness; conversely, the existence of such alternatives "may be evidence that the regulation is not reasonable." Turner, 482 U.S. at 90. In demonstrating the unavailability of ready alternatives, prison officials do not need to prove that they "set up and then [shot] down every conceivable alternative method of accommodating the claimant's constitutional complaint;" however, if an inmate "can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Turner, 482 U.S. at 90–91.

Bratcher "essentially argu[es] that the previous policy already served the purpose of keeping contraband out of the prisons," and is an easy, ready alternative to the current mail policy. Dkt. No. 27 at 8. He asserts that the old policy can be strengthened by supplemental drug tests, "random searches of inmates cell/bed areas," and more stringent monitoring of "inmate phone calls, JPay messaging, and written correspondence." Dkt. No. 27 at 8. In the alternative, Bratcher suggests that if "this is believed not to be enough, the defendant could impose the restrictions implemented in the New Policy on those inmates actually found to have solicited or received contraband . . . ." Dkt. No. 6 at 9. He further proposes hiring new

mailroom staff or transferring staff to ensure that that they "perform the job of inspection at a more satisfactory level." Dkt. No. 6 at 9; Dkt. No. 27 at 8. As a further alternative, Bratcher suggests that instead of "shredding and trashing of mail" VDOC facilities should simply "withhold[] all of the mail" and "store the mail or send it back" to the sender or it could fashion an injunction that applies only to plaintiff. Dkt. No. 63 at 4, 6.

Defendant contends that plaintiff's proposed alternative of reinstating the former VDOC mail policy is "untenable." Dkt. No. 32 at 16. In defendant's view, "[i]t is clear that VDOC's prior policy failed to prevent drug overdoses and deaths in the prisons," and reinstituting the old policy would "allow offenders to utilize Suboxone strips and other methods to infiltrate the prisons with drugs." Dkt. No. 32 at 16. In addition, defendant contends that "Bratcher's suggestions of drug tests, random searches, screening of offender phone calls, or implementing the policy on an individual basis are not ready alternatives to the current policy" because "[d]rug tests, searches, and phone call screenings are all normal incidents of prison life, and have been used both before and after the implementation of the new correspondence policy." Dkt. No. 59 at 24. Regarding Bratcher's suggestion that "prison officials could implement the new policy on an individual basis to those inmates who have been found to have possessed contraband," defendant asserts that "this is not less restrictive than the current policy and requires still more prison resources." Dkt. No. 60 at 5.

As discussed above, the record demonstrates that a return to VDOC's prior mail policy would not be an obvious, easy alternative to the new policy. Indeed, the old policy enabled prisoners more freely to obtain contraband, which resulted in overdoses and resultant treatment costs, and frustrated VDOC's goals of promoting safety and rehabilitation. The supplemental changes proposed by Bratcher would not solve the problems posed by the former policy, as

"[d]rug tests, searches, and phone call screenings are all normal incidents of prison life, and have been used both before and after the implementation of the new correspondence policy," Dkt. No. 59 at 24. In addition, enforcing the drug policy on an individualized basis and hiring and/or firing mail staff would divert additional prisoner resources, and as such, the costs to VDOC's valid penological interests would not be de minimus.

### ii. Remaining Winter Factors

Although Bratcher fails to satisfy the first Winter factor of likelihood of success on the merits with respect to his First Amendment claim, the Court in an abundance of caution will briefly discuss the remaining factors relevant to entitlement to a preliminary injunction.

#### a. Irreparable harm

In addition to demonstrating his likelihood of success on the merits, a plaintiff seeking a preliminary injunction must also demonstrate that he is likely to suffer irreparable harm without injunctive relief. Winter., 555 U.S. at 20. According to Batcher, he is likely to suffer irreparable harm in the absence of an injunction because under the new policy his incoming original mail "will be totally destroyed" and "will be gone forever." Dkt. No. 6 at 2; Dkt. No. 17 at 2. Defendant asserts that plaintiff and his correspondents "are on notice of what documents and items are no longer permitted for offender possession" and hence will be destroyed if mailed to an institution; therefore, any future harm that Bratcher may suffer as a result of the "destruction of items of sentimental or monetary value that are sent through the prison mail system" would be the result of "voluntary actions" by him or his correspondents. Dkt. No. 60 at 7.

It cannot be gainsaid that Bratcher has suffered some irreparable harm since eight original pieces of his mail were destroyed. Dkt. Nos. 27 at 1, 40 at 1. However, it is also worth noting that because Bratcher and his correspondents are now on notice of the requirements of the

new VDOC mail policy, any such future harm would be the responsibility of Bratcher and his correspondents. Therefore, this factor appears to be essentially neutral as between the parties' interests.

### c. Balance of equities

To merit a preliminary injunction, Bratcher also would have to satisfy the third and fourth Winter factors by establishing that "the balance of equities tips in his favor and that an injunction is in the public interest." Winter, 555 U.S. at 20. In attempting to do so, he argues that "if a preliminary injunction is granted, the defendant will be required to operate under the VDOC's previous policy, which for years did a sufficient job of preventing mailed contraband from entering VDOC facilities." Dkt. No. 27 at 2–3. In Bratcher's view, this "would do little to no harm to the VDOC" and in fact "would have beneficial effects" because it would result in VDOC spending less money "on paper and ink." Dkt. No. 27 at 3. At the same time, Bratcher contends the cost of allowing the new policy to remain in effect will be great, as there will be "a total loss of mail for some 20,000 inmates state wide." Dkt. No. 27 at 3.

To the contrary, as discussed above, reinstating the prior "Inmate Correspondence Policy" would pose a significant financial burden on VDOC and would result in a return to a considerably higher rate of inmate overdoses and overdose-related deaths. In addition, the issuance of an injunction would undermine VDOC's ability effectively to manage its prisons and achieve its mission of improving public safety. Although the original copies of inmate mail will continue to be destroyed, this does not in any appreciable way interfere with inmates' right to correspond. Moreover, because inmates and the general public have been placed on notice of the policy, which has been in effect for over a year, inmates and correspondents bear some responsibility for the destruction of any sentimental, pecuniary, or irreplaceable documents.

Under these circumstances, Bratcher fails to demonstrate that the balance of equities with respect to enjoining VDOC's mail policy tips in his favor.

        d. The public interest

With respect to the final Turner factor, Bratcher argues that the public interest would be served by the injunction he seeks "because it is always in the public interest for prison officials to obey the law, especially the Constitution." Dkt. No. 6 at 11. He further asserts that an injunction would "benefit the public by allowing cheaper communication," eliminating "needless spending" by correspondents "on the asserted 'alternatives,'" and reducing "unnecessary spending [by the Commonwealth] on materials to accommodate the new policy." Dkt. No. 6 at 12. To the contrary, as defendant stresses, the public interest weighs much more heavily in favor of policies that encourage security in prisons. Nicholas v. Ozmint, No. 05–3472, 2006 WL 2711852, * 5 (D.S.C. Sept.20, 2006). Because enjoining the new mail policy in favor of the old would bring back a concomitant increase in the incidence of inmate overdoses and potential loss of life, it would hinder the security in VDOC facilities and negatively affect VDOC's ability to rehabilitate offenders successfully. Finally, an injunction would lead to a greater financial burden for VDOC because overdose-related costs far exceed the increased costs associated with copying incoming mail. Particularly in light of the deference owed to prison administrators with regard to matters within their discretion, Wetzel v. Edwards, 635 F.2d 283, 288 (4th Cir.1980), Bratcher fails to show that the public interest would be served by the injunction he seeks.

Because Bratcher has satisfied none of the Winter factors with respect to his claim that VDOC's mail policy violates his rights under the First Amendment, his request for preliminary injunctive relief on that basis must be denied.

**B. Fourth Amendment**

In addition, Bratcher seeks a preliminary injunction on the ground that VDOC's new mail policy violates the Fourth Amendment "by allowing the defendant and his subordinates to seize the plaintiff's mail without a warrant." Dkt. No. 10 at 6. Defendant counters that inmates have much more limited privacy interests than do unincarcerated persons, and that a prison regulation that encroaches on a prisoner's Fourth Amendment right thus "is valid if it is reasonably related to legitimate penological interests." Dkt. No. 32 at 16.

It is well settled that the "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional and internal order." Hudson v. Palmer, 468 U.S. 517, 527–28 (1984). Thus, "a state prisoner has no reasonable expectation of privacy in his cell and is not entitled to Fourth Amendment protection against unreasonable searches and seizures." Giba v. Cook, 232 F. Supp. 2d 1171, 1186 (D. Or. 2002). To that end, any prison policy that permits a prison official to seize an inmate's mail must only be rationally related to a legitimate penological interest to survive a constitutional challenge. As discussed above, VDOC's new inmate correspondence policy is reasonably related to its stated goals of reducing contraband, which furthers inmate safety and institutional security.

In addition, the new policy does not deprive inmates of the content of their mail. Indeed, inmates are provided with photocopies of all incoming personal correspondence received by the institutional mailroom. Because "[p]rison officials are afforded wide discretion in executing policies designed to preserve order and maintain security, including the regulation of prisoners' receipt and possession of personal property," and the policy is rationally related to VDOC's legitimate penological interests, Bratcher is unlikely to succeed on the merits of his Fourth Amendment claim. McFadden v. Mail Room Staff, No. 1:13CV1029, 2014 WL 4924306, at *4

(M.D.N.C. Sept. 30, 2014); see also United States v. Vallez, 653 F.2d 403, 406 (9th Cir. 1981) (stating that the warrantless seizure of a prisoner's mail does not violate the Fourth Amendment if there is a justifiable purpose of imprisonment or prison security), receded from on other grounds by United States v. Goseyun, 789 F.2d 1386, 1387 (9th Cir.1986) (per curiam). Because Bratcher thus cannot satisfy all of the Winter factors as to his Fourth Amendment claim, his request for injunctive relief on that basis must fail.

### C. Fourteenth Amendment

Bratcher further contends that VDOC's new mail policy has deprived him of his protected liberty and property interests without due process of law in violation of the Fourteenth Amendment. The Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To prevail on a procedural due process claim, a prisoner must demonstrate (1) that the state deprived him of a protected interest in life, liberty, or property, and (2) that the deprivation occurred without due process of law. Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989). Before applying the test in Turner, a court must evaluate each alleged Fourteenth Amendment violation to determine that a constitutional right exists and has been infringed upon: if no such right exists, a court need not reach the question of what process is due. Wilkinson v. Austin, 545 U.S. 209, 221 (2005).

#### i. Liberty interest

Liberty interests may arise both under the Constitution and under state law. Wolff v. McDonnell, 418 U.S. 539, 557–58 (1974). The liberty interest asserted by Bratcher is his right to correspond with non-incarcerated individuals "in uncensored communication by letter." See Procunier v. Martinez, 416 U.S. 396, 417–18 (1974), overruled on other grounds by Thornburgh, 490 U.S. 401. While that right is grounded in the First Amendment, it is "qualified of necessity

by the circumstance of imprisonment." <u>Procunier</u>, 416 U.S. at 418.

Bratcher argues that because his right to correspond "is a liberty interest protected by due process," he is "entitled to notice when an incoming or outgoing letter is rejected, a 'reasonable opportunity to protest' for the author of the letter, and referral of complaints to someone other than the censor." Dkt. No. 6 at 10. He concedes that "these protections are afforded to rejected and confiscated mail," but laments that "allowed correspondence is denied them, with the actual correspondence not merely rejected, but totally destroyed." Dkt. No. 27 at 9. In his view, "[c]orrespondence that a prisoner is entitled to have must be afforded, at the very least, those protections which are afforded rejected mail and contraband[, and a]nything less denies [him] due process." Dkt. No. 27 at 9.

Bratcher is correct that "the decision to censor or withhold delivery of a particular letter" such that an inmate is unable to correspond with the sender of the letter "must be accompanied by minimum procedural safeguards." <u>See</u> <u>Montcalm Pub. Corp. v. Beck</u>, 80 F.3d 105, 108 (4th Cir. 1996) (quoting <u>Procunier</u>, 416 U.S. at 417). Specifically, the Supreme Court has concluded that certain minimum procedures are required: "(1) notifying the inmate of the rejection of a letter; (2) allowing the author of the letter a reasonable opportunity to protest the decision; and (3) referring any complaints to a prison official other than the person who made the censorship decision." <u>Id.</u> at 418–19. But, these procedural safeguards inhere only when a prison official decides "to <u>censor</u> or <u>withhold delivery</u> of a particular letter" to the extent that the inmate's protected right to correspond is impacted. <u>Id.</u> at 417 (emphasis added). The policy at issue here does not interfere with Bratcher's liberty interest in corresponding with outside individuals. In fact, under the policy Bratcher challenges the content of all unreturned personal mail is photocopied by staff and provided to the offender; no content is censored. In addition, Bratcher

does not and cannot contend that the photocopies prevent him from interpreting or responding to his mail. As such, the policy does not interfere with his asserted liberty interest in corresponding with non-inmates, and therefore does not violate his Fourteenth Amendment rights.

### ii. Property Interest

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). Thus, courts must look to state law to determine whether a particular claim of right is sufficient to constitute a property interest for purposes of the Due Process Clause. Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law."). Without a constitutionally recognized property interest, a prisoner cannot assert a due process violation. Roth, 408 U.S. at 569.

Bratcher asserts that VDOC's policy of destroying original copies of all personal mail sent to him and providing him with photocopies deprives him of his protected interest in his property. Specifically, he contends that "inmates are afforded the right to their mail - letters, photos, etc. - all of which is physical by its very nature, and thus is a form of property." Dkt. No. 10 at 6. He further alleges that "[d]eprivations of property that are 'authorized' or result from an 'established procedure' may [nevertheless] deny due process regardless of whether there is a post-deprivation remedy." Dkt. No. 10 at 6. At a minimum, Bratcher believes that he is entitled the "opportunity to send the property home to someone." Dkt. No. 6 at 11.

It is well settled that prisoners' property rights are necessarily circumscribed by virtue of their incarceration, and the retraction of those rights is "justified by the considerations underlying

our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948). Though prisoners maintain a

property interest in mail they are authorized to receive, even if it is not yet in their possession,

prisoners do not enjoy the same interest with respect to contraband.[11] See Parratt v. Taylor, 451

U.S. 527, 529–31 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327

(1986).

> Contraband is defined in VDOC Operating Procedure 802.1 III as follows:

> **Contraband** - An item forbidden for entry, possession, or removal from a
> Department of Corrections facility. An item in the possession of, or accessible to,
> an offender that has not been specifically issued to, or authorized for possession
> by the offender; or has not been obtained by the offender in accordance with
> operating procedures.

Thus, any item not authorized by a VDOC official is considered contraband.

> Pursuant to the new mail policy, at all Security Level 2 and above institutions "incoming

offender general correspondence to include the envelope . . . will [be] photocopied in the

institutional mailroom and a maximum of three black and white photocopied pages front and

back will be provided to the offender." In other words, any original piece of mail sent to a

Security Level 2 or above institution after the new mail policy became effective is considered

contraband.[12] An item of a prisoner's belongings may be confiscated if it is

> ... contraband as defined by state or federal law or regulation, DOC and facility
> operating procedures, or violate[] the criteria set in Operating Procedure 803.2,
> Incoming Publications. These criteria apply even though the item may have come
> from some source other than a publication.

VDOC Operating Procedure 802.1 VII E. 4.a. Because all original incoming mail received by

inmates after April 17, 2017 is contraband, it is subject to confiscation under VDOC regulations,

---

[11] To the extent that Bratcher maintains a property interest in the content of those letters, the new
mail policy does not deprive him of that right.

[12] Certain forms mail not relevant to this discussion are excepted, such as legal mail.

and the inmates maintain no property interest in those items. Thus, confiscation of an inmate's original mail is not subject to the protections of the Due Process Clause.

Bratcher cites Caldwell v. Miller, 790 F.2d 589, 607 (7th Cir. 1986) for the proposition that he is entitled to send copies of his letters home before they are photocopied and destroyed, but that case is inapposite because it involved property possessed by an inmate that were taken following an institutional lockdown. Unlike the plaintiff in Caldwell, Bratcher never possessed the eight pieces of original mail that were shredded, and he does not allege that any mail already in his possession has been or will be confiscated and destroyed.[13] Because Bratcher had no constitutionally recognized property interest in the original pieces of mail he received after April 17, 2017, which was contraband under VDOC regulations, he cannot assert a due process violation that would entitle him to injunctive relief.

For all of the foregoing reasons, Bratcher fails to demonstrate his entitlement to the extraordinary remedy of a preliminary injunction, and his renewed motion for such relief accordingly must be denied.

### IV. Defendant's Renewed Motion for Summary Judgment[14]

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that judgment on

---

[13] To the extent that the new mail policy creates a distinction between mail received prior to the date that the policy was instituted and mail received afterwards, such a distinction does not contravene the purpose of the new policy, which is to reduce the amount of contraband entering the institutions.

[14] The facts upon which the defendant relies in moving for summary judgment are essentially identical to those established in connection with Bratcher's Renewed Motion for Preliminary Injunction. Accordingly, they will not be reiterated here.

the pleadings is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (moving party bears the burden of persuasion on all relevant issues). To meet that burden, the moving party must demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a moving party has met its burden to show that it is entitled to judgment as a matter of law, the burden then shifts to the non-moving party to point out the specific facts which create disputed factual issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Those facts for which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. Matsushita, 475 U.S. at 587.

In this case, Bratcher has filed "a civil rights action . . . for injunctive and declaratory relief" concerning VDOC's new mail policy; his request for relief is limited to equitable remedies. Dkt. No. 10 at 1, 6. Specifically, Bratcher requests that this Court issue a declaratory judgment stating that: (1) he has a right to be delivered his actual mail absent a policy that is reasonably related to legitimate penological goals; (2) VDOC's new mail policy is is an

exaggerated response to the alleged mass influx of drugs and is thus not reasonably related to a

legitimate penological interest;  (3) the new policy denies him property that is sent to him by

mail, without process and remedy, violating the Fourteenth Amendment; (4)  defendant, or any

of his subordinates, must first obtain a warrant before seizing Bratcher's mail, and (5) the right of

any inmate correspondent may not be hindered by the seizure and ultimate destruction of his

mail l. Dkt. No. 10 at 6.  In addition, Bratcher seeks the entry of a permanent injunction:  (1)

prohibiting the defendant and his subordinates from enforcing the new VDOC mail policy; (2)

ordering the defendant and  his subordinates to continue enforcing the previous mail policy; (3)

and requiring the defendant to submit to the Court any new proposed policy regarding inmate

correspondence, to be considered after a hearing, before any further changes are made. Dkt. No.

10 at 6–7. Bratcher does not seek monetary damages. See Dkt. No. 27 at 8.[15]

### A.  First Amendment Claim

At this juncture, it is apparent that the defendant is entitled to summary judgment on

Bratcher's claim that the VDOC mail policy violates his First Amendment right to receive mail.

As discussed in detail in connection with Bratcher's Motion for Preliminary Injunction, a prison

policy may infringe on inmates' constitutional rights so long as the policy is "reasonably related

to penological interests." Turner, 482 U.S. at 89.  When considered in light of the four Turner

factors, the mail policy clearly is related to legitimate penological interests.

As to the first Turner factor, evidence supplied by the defendant establishes that the

policy is logically connected to the legitimate government interests of keeping offenders safe and

running a secure prison system. See Bell, 441 U.S. at 546-47 (maintaining institutional security

---

[15] Defendant argues that he is immune from suit in his official capacity for monetary damages.
Dkt. No. 59 at 13 -15, 26-27. Because Bratcher seeks only injunctive relief in this lawsuit,
defendant's argument in this regard is irrelevant.

and preserving internal order are "essential goals" of correctional facilities). The mail policy was developed and adopted specifically to curb the influx of drugs into Virginia institutions through the mail system. Vargo Aff. ¶¶ 22 -28. By requiring inmates' incoming general correspondence to be photocopied, the risk of smuggling drugs into institutions in the original pieces of mail is significantly reduced, as is demonstrated by the marked decrease in drug-related prisoner deaths and drug overdoses VDOC experienced after the policy was implemented in early 2017. Vargo Aff. ¶12 -13. The mail policy thus is reasonably related to the legitimate penological interest of prohibiting contraband from entering Virginia prisons. See Lee v. Md. Div. of Corr., 2017 WL 713760 (D. Md. Feb. 22, 2017) (upholding policy prohibiting greeting cards from entering correctional facilities because they were frequently used to smuggle Suboxone film into prisons).

In his Opposition, Bratcher "disputes" the statistics provided by the defendant in support of the new mail policy. Bratcher characterizes these statistics as "misleading" and argues that they "include incidents where drugs did not come into the prisons by mail" and hence did not "justify a complete mail ban." Dkt. No. 77 at 4. Bratcher supports this position with his own affidavit, in which he states that since the new mail policy took effect he personally has witnessed "a number of drugs within the prison," inmates getting high from Suboxone strips, and "people possessing, using, and getting caught with drugs." Dkt. No. 77, Bratcher Aff. ¶¶ 2 -4. Bratcher has also supplied the affidavit of a fellow inmate, Mychael Daniels, who states that he has acquired one disciplinary conviction related to drugs during his incarceration, and the drugs he used did not enter the prison through the mail. Id., Daniels Aff. ¶¶ 3 -5.

Taken as true, these assertions fail to call into question the determination that the VDOC mail policy is rationally connected to legitimate government interests. There is no dispute that

the policy was implemented to curb the transmission of illicit drugs into Virginia institutions through the mail system. Vargo Aff. ¶¶ 22 -28. Nor has Bratcher created any genuine issue of fact as to the efficacy of that policy, which has resulted in a significant decrease in drug-related prisoner deaths and drug overdoses. Id. The standard is not one of perfection, as Bratcher appears to assume, and the fact that he and a fellow prisoner have observed instances of drug use following implementation of the mail policy does not undermine the defendant's showing that it is logically connected to the legitimate government interests of keeping offenders safe and the prison system secure. See Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992) (nonmoving party may not defeat summary jusgment with beliefs, conjecture, speculation or conclusory allegations). For these reasons, the first Turner factor weighs heavily in defendant's favor.

As to the second Turner factor, Virginia inmates have multiple alternative means of exercising their First Amendment rights under the new policy because it is content-neutral and does not prohibit their ability to receive publications or to access the content in their mail, including letters and greeting cards. The only difference is that the inmate receives a copy of the original document. In addition, inmates can utilize a JPay device to send and receive secure messages and photographs from family and friends, they are allowed to possess photographs taken during visitation, and they can order and receive photographs mailed from a vendor. Vargo Aff. ¶¶ 45-46.

Bratcher argues in his Opposition that these alternative means are ineffective and unacceptable for several reasons: photocopies can "produce nothing more than a fuzzy, enigmatic black and white mess," JPay is not affordable by all inmates and is inaccessible during lockdowns, and kiosks can malfunction or be "controlled by gang activity." Dkt. No. 77 at 7.

36

This is an instance, however, where "tough tradeoffs" are required in prison administration. See In re: ... Five Percenters, 174 F.3d at 470. Because the mail policy at issue affects multiple correctional institutions, it is particularly appropriate for a court to defer to the 'informed discretion of corrections officials." Thornburgh, 490 U.S. at 418. Accordingly, the second Turner factor is deemed to weigh in favor of the defendant.

Turner next requires a court to consider the impact that accommodation of the plaintiff's asserted right would have on other inmates, prison officials, and the allocation of prison resources. In this instance, it is apparent that allowing prisoners to receive their original mail again would allow drugs and contraband once again to enter prisons at a significantly higher rate. Drug possession incidents, instances of non-fatal drug overdoses, and inmate deaths due to drug overdose have all decreased significantly since VDOC implemented the new mail policy. Vargo Supp. Aff. ¶¶ 12 – 19. Accordingly, abandoning this policy after it has achieved such success would be irresponsible and clearly would subject offenders and prison staff to unnecessary risks and costs. Vargo Supp. Aff. ¶ 24. The third Turner factor thus weighs in favor of the defendant.

Lastly, there is no adequate, ready alternative to VDOC's current mail policy. Bratcher's suggestion that the former policy should be reinstated is simply untenable. That policy failed to prevent overdoses and deaths caused by drugs smuggled into prisons through their mail systems, while the current policy has had some success in reducing the numbers of incidents related to drug possession. Bratcher's alternative suggestions of drug tests, random searches, screening of telephone calls, and implementing the mail policy only on an individual basis are equally unworkable. Drug tests, searches, and phone call screenings are all normal incidents of prison life, and were used both before and after the new mail policy was implemented. Those practices are unrelated to incoming mail, and in this case VDOC officials were aware that the problem of

drug contraband entering the prison system directly related to incoming mail. Since the new mail policy is targeted specifically at solving or at least reducing that problem, the steps Bratcher suggests would not constitute an adequate alternative to the mail policy. Nor is Bratcher's suggestion in his Opposition that "defendant could simply do a better job of making sure his subordinates follow existing policy" a realistically helpful approach. Dkt. No. 77 at 8. The fourth Turner factor thus also weighs in favor of the defendant, and he is entitled to summary judgment on Bratcher's claim that the mail policy violates the First Amendment. See Strebe v. Kanode, Case No. 7:17cv00321 (W.D. Va. Sept. 17, 2018) (granting summary judgment to defendants on inmate's First Amendment challenge to the mail policy because "[p]lainly, after considering the four Turner factors, the revised VDOC mail policy passes constitutional muster."); Dkt. No. 78, Ex. 1.

### B. Fourth Amendment Claim

As is thoroughly discussed above, the Fourth Amendment protects against unreasonable search and seizure, and provides only a limited privacy interest to incarcerated persons. Bell, 441 U.S. at 545-46; Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981). As with other prison regulations that encroach on inmates' constitutional rights, a policy that affects an inmate's Fourth Amendment right is valid under Turner if it is reasonably related to legitimate penological interest. Bell, 441 U.S. at 545-46. In evaluating such a policy, a court must consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. at 559. In addition, a court in making such an analysis for § 1983 purposes must defer to prison officials' expertise when determining whether a particular policy violates constitutional principles. Id. Here, it would be redundant to recite again the numerous legitimate penological interests that are served by VDOC's current mail

policy, and the policy accordingly is justified despite any minor infringement it may cause to an inmate's Fourth Amendment rights. Accordingly, defendant is entitled to summary judgment on Bratcher's Fourth Amendment challenge to the mail policy.

### C. Fourteenth Amendment Due Process Claim

The Due Process Clause applies when a government action deprives a person or a legitimate liberty or property interest. Roth, 408 U.S. at 569. It is not implicated when a negligent act by a state official causes an unintended loss of property. Daniels v. Williams, 474 U.S. 564, 569 (1972). Such negligent and unintentional deprivations of property "do not violate [the Due Process] Clause provided … that adequate state post-deprivation remedies are available." Hudson v. Palmer, 468 U.S. 517, 533 (1984) (due process satisfied by post-deprivation remedy to redress intentional destruction of personal property by prison guard during a "shakedown").

Virginia has provided adequate post-deprivation remedies for deprivations caused by state employees. Under the Virginia Tort Claims Act, Va. Code Ann. § 8.01-195.3, Virginia has waived sovereign immunity for damages for "negligent of wrongful" acts of state employees acting within the scope of employment. The Fourth Circuit has held that the Virginia Tort Claims Act and Virginia tort law provide adequate post-deprivation remedies for torts committed by state employees. See Wadhams v. Procunier, 772 F.2d 75, 78 (4th Cir. 1985). Bratcher argues in his Opposition that because "post deprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than unauthorized and random action," Hudson, 468 U.S. at 532, this law does not apply. Bratcher forgets, however, that under current VDOC policy incoming mail is contraband rather than property, and he therefore cannot prevail on his claim that the loss of eight pieces of his

original correspondence violated the Fourteenth Amendment.

### D. Permanent Injunction

Lastly, even if Bratcher were otherwise entitled to relief, his request for a permanent injunction of the VDOC mail policy still would fail. "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." Winter, 555 U.S. at 381, quoting Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 546 n. 12. Thus, a court's "analysis of the propriety of a preliminary relief is applicable to any permanent injunction as well," Winter, 555 U.S. at 381-82, and Bratcher's prayer for a permanent injunction fails for the reasons discussed above in connection with his renewed Motion for Preliminary Injunction.

Because Bratcher has failed to demonstrate a genuine issue of material fact with respect to the constitutionality of VDOC's mail policy, defendant's Renewed Motion for Summary Judgment will be granted.

### V. Conclusion

For the foregoing reasons, plaintiff's Renewed Motion for a Preliminary Injunction [Dkt. No. 55] will be denied. Defendant's Renewed Motion for Summary Judgment [Dkt. No. 58] will be granted, and plaintiff's Motion for Extension of Time to File Reply [Dkt. No. 67] will be denied, as moot. An appropriate Order and Judgment shall issue.

Entered this 26 day of September 2018.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia

/s/
Anthony J. Trenga
United States District Judge